330 P.2d 122

Paul P. EARDLEY, Plaintiff and Appellant,

v.

Jimmie SAMMONS and Beulah G. Sammons, his wife, Defendants and Respondents.

No. 8834.

Supreme Court of Utah.

Oct. 3, 1958.

McKay, Burton, McMillan & Richards, Salt Lake City, for appellant.

Charles M. Pickett, St. George, for respondents.

CROCKETT, Justice.

Plaintiff Paul P. Eardley appeals from a decree absolving defendant Jimmie M. Sammons from partnership responsibility and also from awards to him and his wife Beulah G. Sammons in connection with termination of the joint operation of a cafe.

The 18 grounds of error assigned can be reduced to and treated as three main stems: that the court erred in determining that plaintiff had elected to take over the cafe permanently and assume its obligations; in the procedure followed as to dissolution, accounting and winding up of the business; in the awards made to the defendants, both as to salary and division of claimed profits.

Eardley owns and operates a gas station on Highway U. S. 91, on the main street of St. George, Utah; immediately adjacent is the Dixie Cafe. There is a large amount of truck and tourist traffic through St. George, a good deal of which is at other than usual business hours; particularly in summer, when, because of the heat, there is much travel during the night. It is therefore a special convenience for travelers to use the service station and cafe in one stop and their operation is mutually advantageous.

Late in July, 1955, plaintiff discussed with Jimmie Sammons, who had had cafe experience, a proposition that they should acquire and operate the Dixie Cafe. Consequent thereto, Eardley arranged its purchase for $30,000: $1,000 down and a like monthly payment for four months, and thereafter $200 per month with interest on the balance at 5%. Eardley advanced the $1,000 down payment. The contract was executed in Sammons' name with the understanding that he would operate the cafe and that Eardley would be a silent partner. No further details of their arrangement were then worked out, except that the parties had a general understanding: that the cafe would pay for itself and the expenses of operation; that Sammons would receive a living wage for his services (in October this was fixed at $150 for each two-week period); and then any profits and increase in value of the business would be shared equally.

The cafe operation by these parties commenced August 9, 1955. Unfortunately Sammons drank liquor excessively and was often unable to attend to the business. On several occasions he was jailed for drunkenness and his wife Beulah Sammons, who was then elsewhere employed, had to come in and look after the cafe. Because of these circumstances the business did not prosper. By April, 1956, the payments on the purchase contract were $4,000 in arrear and the seller had threatened forfeiture and ouster. Eardley visited Sammons in jail and, based on the hope of reform, it was agreed that Eardley would advance another $1,100, the minimum required to

avoid forfeiture at that time; this upon the assurance by Sammons that payments for supplies could abide for a time and operate on credit, and that the other $2,900 could be raised shortly from sources Sammons had intented to use to pay for said supplies. In connection with this transaction, Eardley had each of the defendants sign an instrument purportedly assigning their interest in the cafe over to him. For reasons, the detail of which is unimportant here, the trail court regarded the purported assignment as one only for purposes of Eardley's protection against possible claims of other creditors and not, as between the parties, intended to actually assign the cafe to Eardley. Neither party here questions that view.

■ The operation of the cafe continued as before: Sammons drinking excessively and Beulah filling in to manage the business until finally, on July 5, 1956, she left him. On July 10 he was again in jail, leaving the cafe to be run by other employees. The next day, July 11, Jimmie was released and delivered the keys to Eardley who took over the cafe. On that same day Eardley commenced this action for dissolution of what he termed the "joint venture," for an accounting and for damages against Sammons for breaching his obligations under their agreement. Sammons rejoined in kind. The parties and the trial court seemed reluctant to classify their relationship, referring to it variously as a joint venture, a partnership, or merely as an association. There is no question but that it falls within the definition of partnership as " * * * an association of two or more persons to carry on as coowners a business for a profit."[1]

The trial court was confronted with an extremely difficult task in attempting to arrive at an accounting. To say that Sammons' bookkeeping had been haphazard is somewhat of an understatement. There had been no orderly keeping of books or records; there was available no adequate inventory of supplies at the time of purchase; nor when Eardley took over; nor even a definite account of the cash on hand at that time. The beclouded picture was not cleared up much by Eardley's bookkeeper, John W. Smith, who, although competent, failed to make accurate account of inventories and supplies on hand and subsequently used in the business. He testified that he set up the best accounting possible from the information available, which indicated that the business owed debts of $8,784.65, including the amount then due on the purchase contract, but not including amounts paid in by the parties nor unpaid salaries claimed by the Sammonses. The court had to make the best adjustment of accounts possible from the

1. Sec. 48–1–3, U.C.A.1953.

available evidence, and having done so, every reasonable inference fairly to be derived therefrom is to be indulged in favor of the accounting so arrived at. We therefore do not concern ourselves with any recomputation of accounts but analyze the case upon the basis of the findings made by the trial court.

The court found that Eardley had elected to take over the business and operate it, and decreed that he should continue to do so. As to accounting: it established an assets and liabilities account, excluding therefrom the capital contributions, and also the advances, made by the partners. Upon the basis thereof it determined the net worth, that is, the assets in excess of liabilities, to be $1,262.04, and awarded judgment against Eardley and in favor of Jimmie Sammons for one-half of this amount as a so-called "profit," of $631.02; and similarly awarded him judgment for $686.05 as adjusted unpaid salary. The latter figure was reached by deducting $386.13, the value of cash and supplies Sammons took for his own use, from the court determined figure of $1,072.18 accrued unpaid salary to him, making a total net judgment in favor of Sammons of $1,317.07. To Beulah Sammons judgment awarded $1,184.40 for wages accrued at the rate of 75¢ per hour, plus $100 she had loaned the business to pay for supplies.

The first matter to consider is Eardley's challenge of the trial court's finding that he had made an election, and was therefore obliged to take over and run the cafe on a permanent basis. It is undoubted that it would have been within the prerogative of the trial court to so decree if he had made an unequivocal choice.[2] Eardley insists that he had not done so and that there is no support in the evidence for any such finding. He avers that his going into the cafe was not from choice, but under compulsion to save it from further losses as it had been doing under Sammons' neglect and mismanagement. In support of his position he points out that upon the day he was compelled to take over, he commenced this action seeking termination of the relationship, an accounting and winding up of the business. Sammons' own pleadings are in accord; he sought only a share of the "profits," but did not contend that Eardley was obliged to assume responsibility for the business permanently.

Inasmuch as Jimmie Sammons disabled himself to the extent that the business was being neglected and ruined, it appears that the only prudent thing Eardley could do was to take charge for such time as

2. Sec. 48–1–35(2) (b), U.C.A.1953, permits a partner who has not wrongfully caused the dissolution to continue the business if he so desires for the remaining the term of the partnership.

necessary to conserve the business. Where he was acting under such compulsion, it cannot justly be said that he made an election to take over the business permanently. As above indicated, the trial court affirmatively found that the assignment to Eardley was not bona fide. That being so, it would not be any evidence of his election to take over the business. In order to impose such responsibility upon him, the choice must have been made voluntarily and indicated unequivocally. This the evidence will not support. Accordingly the finding that Eardley elected to take over the business permanently must be vacated. As a consequence thereof, the determination that he should be charged with all of the obligations of the business, including the payments on the purchase contract, and releasing the defendant Jimmie Sammons from such obligations, must also fall.

■ In view of the conclusion just stated, it is necessary to remand this case for further proceedings in the district court. Therefore, it is our duty to "pass upon * * * all questions of law involved in the case ⁓ * * necessary to [its] final determination * * *." [3]

■ Under the circumstances existing here, particularly where both partners had requested termination and dissolution, it is incumbent upon the court to require a sale and apply the proceeds in accordance with the priorities set forth in the statute,[4] which is as follows: (1) amounts owed to creditors; (2) amounts owing to partners for contributions not capital; (3) amounts owing to partners for capital; and (4) division of profits.

■ It was error to set up the amount of $1,262.04 as "profits" and award Sammons one-half thereof before repaying to Eardley and Sammons their contributions under classes (2) and (3) above. Under such classes Eardley had contributed a total of $2,556, comprised of: $1,000 down payment; $456 for supplies; and $1,100 to apply on the purchase contract. Sammons had contributed $430 for supplies.

■ It is further to be observed that upon the record as we view it, Sammons is not entitled to wages as a claim prior to other operating expenses and payments on the purchase contract. While it is true that ordinarily where one partner is not working for the business, and the other one is, it might reasonably be assumed that the latter is to receive compensation for his services. However, any such salary, and the priority of its payment, as between the parties, is a matter for agreement between them.

■ We see no indication of any commitment by Eardley that Sammons could

---

3. See Rule 76(a) U.R.C.P.; also Joseph v. W. H. Groves, Latter Day Saints Hospital, 7 Utah 2d 39, 318 P.2d 330.

4. Sec. 48–1–37(2) U.C.A.1953.

claim wages ahead of other operating expenses and payments on the contract. All indications are to the contrary. It is quite unlikely that Eardley would initiate the enterprise, advance the capital, and in effect guarantee a salary to Sammons ahead of operating expenses, all for the purpose of acquiring a business creating a job for Sammons. Eardley risked his money and Sammons was to risk something, which plainly was his labor to be compensated for in the event primary operating obligations were met and the business earned such salary. That such was the understanding is borne out by Sammons' own statement in his answer:

> " * * * That *after* the payment of the installments upon the contract for the sellers of the property and the operating expenses thereof, the Defendants were to take a living wage from the said property and residue, if any, of the profits from said business would then be divided equally between Plaintiff and Defendants." (Emphasis added.)

The above reasoning does not apply to Beulah Sammons. She was not a party to the partnership agreement but was simply hired to work in the cafe. Her wages in the sum of $1,184.40 accrued at the modest rate of 75¢ per hour. The partnership business itelf is primarily responsible for this debt; and Eardley as a general partner is also responsible for it. The judgment in her favor for that amount plus $100 she advanced to the business is affirmed.

■ Upon remand and liquidation, there should be a further accounting by Eardley from the time he took over the business until such sale takes place. The obligations should be paid in accordance with the statutory priorities hereinabove set forth; then the partners repaid their contributions, that is, Sammons his wages and Eardley his advances, and anything remaining divided between them. If Eardley, who apparently has been operating the business since the schism between them, decides to keep the business, he is accountable to Sammons, under the statutory rules hereinabove set forth, for one-half the value of any equity the partnership had in the business at the time of the dissolution.

The case is remanded for further proceedings not inconsistent with this opinion, the parties to bear their own costs.

McDONOUGH, C. J., and WADE, WORTHEN and HENRIOD, JJ., concur.